CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 01 2012

JULIA C. DUDLEY, CLERK
BY: /s/
  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| GLOBAL CROSSING TELECOMMUNICATIONS, INC., Plaintiff, | ) ) ) ) | Civil Action No. 7:11-cv-00503 |
| | ) | **MEMORANDUM OPINION** |
| v. | ) ) | |
| NTELOS TELEPHONE, INC. Defendant. | ) ) | By: Samuel G. Wilson United States District Judge |

This is an action by plaintiff Global Crossing Telecommunications, Inc. ("Global Crossing") by defendant nTelos Telephone, Inc. ("nTelos") pursuant to the Communications Act of 1934,[1] Virginia state law, and various tariffs, alleging that nTelos overcharged Global Crossing for local "jointly provided switch access" services.[2] nTelos has filed a motion to stay the case and refer it to the Federal Communications Commission under the doctrine of primary jurisdiction. Global Crossing opposes the motion. Because the FCC possesses a unique expertise in this highly specialized field, and because the resolution of this matter will involve questions of technical fact turning on industry standards, the court will grant nTelos' motion, stay this matter, and refer it to the FCC for resolution.

I.

Global Crossing is a telecommunications carrier providing long-distance services to customers throughout the United States. The company provides those services through its own facilities and through "switched access services" it procures from companies like nTelos, which

---

[1] 47 U.S.C. § 151 et seq., as amended by the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56.

[2] Global Crossing filed its original complaint in federal court in the Eastern District of Virginia. The parties later filed a joint motion to dismiss the original defendant, Lumos Networks, Inc.; add nTelos as a defendant; and transfer venue to the Western District of Virginia.

are known as "local exchange carriers." In some cases, switched access is jointly provided by two local exchange carriers, a service known as "jointly provided switched access" or "JPSA." Local exchange carriers charge long-distance carriers for switched access, JPSA or otherwise, by reference to an "access service request" and a series of tariffs.[3] The access service request is a fill-in-the-blank form by which a long-distance carrier orders switched access from a local exchange carrier. And the tariffs establish, among other things, the applicable mileages and the billing percentage to which each local exchange carrier is entitled for JPSA services. The tariffs, in turn, are interpreted with reference to the Multiple Exchange Carrier Access Guidelines and industry standards.

Global Crossing alleges that, in an effort to route long-distance calls to Waynesboro, Virginia, it ordered two services from local exchange carriers. First, it ordered a "high capacity service" between Roanoke, Virginia and Staunton, Virginia, to be provided by Verizon Virginia, Inc.—the sole owner of the sixty-eight-mile telecommunications route between Roanoke and Staunton. Second, Global Crossing ordered several lower-capacity services between Staunton and Waynesboro, to be jointly provided by Verizon and nTelos. Verizon and nTelos shared ownership of the twelve-mile route between Staunton and Waynesboro; Verizon owned fifty-three percent of the route, while nTelos owned forty-seven percent. According to Global Crossing, Verizon, for the most part, correctly charged Global Crossing for the high-capacity service from Roanoke to Staunton and for Verizon's portion of the lower-capacity service from

---

[3] The tariffs applicable in this case are the Virginia Telephone Companies' Virginia Access Tariff No. 2, ICORE, Inc. F.C.C. No. 2 ("ICORE 2"), nTelos Network Inc. S.C.C. No. 3, National Exchange Carrier Association No. 4 ("NECA 4"), and National Exchange Carrier Association No. 5 ("NECA 5"). The NECA 4 tariff establishes "route pairs" and billing percentage requirements for interconnecting switches, including the billing percentages for the Roanoke-Waynesboro route and the Staunton-Waynesboro route. The ICORE 2 and NECA 5 tariffs allow each company providing access services to separately bill customers for its portion of the service provided, and they specify the formula by which nTelos must calculate its per-minute mileage.

Staunton and Waynesboro. nTelos, however, allegedly charged Global Crossing for using a Roanoke-to-Waynesboro telecommunications route in which it owned a ninety-three percent stake, and not the piecemeal route it ordered from Verizon and nTelos. Consequently, nTelos allegedly billed Global Crossing for ninety-three percent of an eighty-mile route, instead of forty-seven percent of a twelve-mile route. That billing decision, Global Crossing claims, resulted in more than $500,000 of excess local-access charges.

The parties do not entirely agree on the nature of this dispute. On the one hand, Global Crossing alleges that nTelos is either (1) not providing the Roanoke to Waynesboro services for which it is billing, (2) billing for a services that nTelos is providing but to which Global Crossing has not subscribed, or (3) calculating the bill improperly according to the applicable tariffs. (See Am. Compl. 4, E.C.F. No. 27-1.) On the other hand, nTelos characterizes the crux of the dispute as a question of national industry standards for ordering and billing JPSA services. (Mot. to Stay 1, E.C.F. No. 31.) And in its most recent filing, Global Crossing has responded to nTelos' motion to stay by recharacterizing the dispute as "the application of the plain language of the tariffs" to "clear facts." (Resp. to Mot. to Stay 2, E.C.F. No. 38.)

## II.

nTelos has moved the court to stay this action and refer it to the FCC under the doctrine of primary jurisdiction, arguing that this dispute involves the kind of highly technical issues within the FCC's particular field of expertise. Global Crossing argues that this case revolves around the type of statutory and contract interpretation well within the conventional experience of federal district courts. The court finds that the dispute indeed raises issues of highly technical, industry-standard-dependent facts that are not within the court's conventional experience, but

which fall squarely within the FCC's specialized experience, expertise, and insight. Accordingly, the court will stay the action and refer it to the FCC.

The doctrine of primary jurisdiction enables a court, under appropriate circumstances, to "refer" certain issues to an administrative agency and then stay the proceedings or dismiss the case without prejudice. See Reiter v. Cooper, 507 U.S. 258, 268–69 (1993). The doctrine "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." Nat'l Commc'ns Ass'n v. AT&T, 46 F.3d 220, 222–23 (2d. Cir. 1995) (quoting Far E. Conference v. United States, 342 U.S. 570, 574 (1952)). Generally, courts apply primary jurisdiction in cases involving technical, intricate questions of fact and policy that Congress has assigned to a particular agency. Id. There is, however, "no fixed formula . . . for applying the doctrine of primary jurisdiction." Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996) (quoting United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956)).

To focus the analysis, courts often employ a four-factor test:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
(2) whether the question at issue is particularly within the agency's discretion;
(3) whether there exists a substantial danger of inconsistent rulings; and
(4) whether a prior application to the agency has been made.

Nat'l Commc'ns Ass'n, 46 F.3d at 222; Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va., 759 F. Supp. 2d 772, 786 (E.D. Va. 2011). The doctrine is particularly appropriate when the issue involves technical questions of fact bound up with an assessment of industry standards. See Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 305 (1976); Total Telecomm. Svcs., Inc. v. Am. Tel. & Tel. Co., 919 F. Supp. 472, 480 (D.D.C.

1996) ("Questions involving standard industry practices should also be entertained by the FCC." (citing Ricci v. Chi. Mercantile Exch., 409 U.S. 289, 305 (1973))). In any case, the decision to apply the doctrine is a matter left to the discretion of the trial court. See Envtl. Tech. Council, 98 F.3d at 789.

With that guidance in mind, the court turns to the (known) facts of this case and concludes that referral to the FCC is appropriate because the questions in this case are not within the court's conventional experience and are instead well-suited to FCC determination.[4] While the parties do not—at least presently—agree on the questions existing in this case, it is clear to the court that whatever the question, it will necessitate a factual determination of precisely *what* Global Crossing ordered from local exchange carriers nTelos and Verizon. Specifically, there must be some finding as to whether Global Crossing ordered Staunton-Waynesboro service or Roanoke-Waynesboro service. Settling that fundamental dispute will require an interpretation of Global Crossing's access service request, which will in turn raise questions of industry customs and practices. Even Global Crossing's own expert says as much: "By ignoring standard industry billing practices and common application of the NECA tariffs in the interpretation of ASRs, [nTelos] significantly overbills Global Crossing." (Expert Report 6–7, E.C.F. No. 31-1.)

---

[4] The parties agree that they have made no prior agency application. And, at this relatively early stage in the case, it is unclear whether the court's opinion would result in a danger of inconsistent rulings. While these two factors weigh in favor of retained jurisdiction, they are far outweighed by the first two National Communications factors.

After making that initial factual determination, the decision maker must discern *how* nTelos should be charging Global Crossing under the applicable tariffs.[5] That question, too, requires reference to industry standards: "Section 2.4.7 (B) of the ICORE 2 and NECA 5 tariffs provides that . . . a bill-rendering company 'will render the bill in accordance with the industry standards.'" (Am. Compl. 5, E.C.F. No. 27-1) (quoting ICORE 2 and NECA 5). And "where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the inquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must . . . go to the [agency]." W. Pac. R.R. Co., 352 U.S. at 66 (quoting Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291 (1922)). Such determinations are "reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts . . . is indispensable, and such acquaintance is commonly to be found only in a body of experts." Id. (quoting Great N. Ry. Co., 259 U.S. at 291).

It is not difficult to imagine a profusion of additional issues. Whether or not those additional issues indeed arise, the issues that are *certain* to arise, and their accompanying highly technical factual determinations—inseparable as they are from industry standards and customs—make it plain to this court that referral to the FCC is the proper course.[6]

---

[5] Global Crossing is not contesting the *rate* being charged, but nTelos' alleged refusal to recognize the Staunton-Waynesboro route as a *valid route under the tariff*.

[6] Global Crossing argues that nTelos waived its right to seek referral to the FCC by failing to raise it in its original answer. However, referral to the FCC is not treated as an affirmative defense and is commonly made after partial discovery. In every case the plaintiff cites in which referral was denied as waived, referral was not requested until either appeal or after trial had begun. The court finds that nTelos has not waived its right to seek referral.
Global Crossing also claims referral would be contrary to the administration of justice because six months have passed, discovery has commenced, and administrative review typically takes longer than judicial review. None of these assertions in any way differentiate Global Crossing's circumstances from

## III.

The issues in this case will involve the determination of highly technical facts, and the determination of those facts will in turn involve careful reference to industry standards and customs. Global Crossing's own amended complaint and expert report show as much. Such matters are not within the conventional experience of this court, and the court will therefore grant nTelos' motion to stay and refer this matter to the FCC.

**Enter**: June 1, 2012.

UNITED STATES DISTRICT JUDGE

---

those of any number of other telecommunications companies facing referral. The court finds that referral would not be contrary to the administration of justice.